AO 91
Rev. 11/82

**CRIMINAL COMPLAINT**

ORIGINAL

| UNITED STATES DISTRICT COURT | CENTRAL DISTRICT OF CALIFORNIA |
|---|---|
| UNITED STATES OF AMERICA<br>v.<br><br>HAMMAD RAIZ SAMANA | DOCKET NO. |
| | MAGISTRATE'S CASE NO.<br>05- **05-1662M**<br>CLERK, U.S. DISTRICT COURT<br>FILED<br>AUG - 2 2005<br>CENTRAL DISTRICT OF CALIFORNIA<br>BY_____DEPUTY |

Complaint for violation of Title 18, United States Code §§ 1114; and 1117.

| NAME OF MAGISTRATE JUDGE<br>HON. PAUL GAME JR. | UNITED STATES<br>MAGISTRATE JUDGE | LOCATION<br>Los Angeles, CA |
|---|---|---|

| DATE OF OFFENSE<br>Beginning in or about June 2005, and continuing through July 5, 2005 | PLACE OF OFFENSE<br>Los Angeles and Orange County | ADDRESS OF ACCUSED (IF KNOWN) |
|---|---|---|

COMPLAINANT'S STATEMENT OF FACTS CONSTITUTING THE OFFENSE OR VIOLATION:

Beginning in or about June 2005, and continuing through July 5, 2005, in Los Angeles and Orange Counties, within the Central District of California, defendant HAMMAD RIAZ SAMANA conspired with others to murder United States Armed Forces Personnel, and one or more of the conspirators did an overt act to effect the object of conspiracy, in violation of Title 18, United States Code, Section 1117.

BASIS OF COMPLAINANT'S CHARGE AGAINST THE ACCUSED:
(See attached affidavit which is incorporated as part of this Complaint)

MATERIAL WITNESSES IN RELATION TO THIS CHARGE:

| Being duly sworn, I declare that the foregoing is true and correct to the best of my knowledge. | SIGNATURE OF COMPLAINANT<br>James Clinton Judd<br><br>OFFICIAL TITLE<br>Special Agent - Federal Bureau of Investigation |
|---|---|

Sworn to before me and subscribed in my presence,

| SIGNATURE OF MAGISTRATE JUDGE(1) | DATE<br>August 2, 2005 |
|---|---|

1) See Federal Rules of Criminal Procedure rules 3 and 54.

KES:tm        REC:  DETENTION

KES

A F F I D A V I T

I, James Clinton Judd, being duly sworn, hereby depose and say:

1.    I am a Special Agent ("SA") with the Federal Bureau of Investigation ("FBI") and have been so employed since August of 1995.  I am currently assigned to the Long Beach Resident Agency ("LBRA") of the FBI Los Angeles Field Office.  I have participated in numerous criminal investigations, such as investigations of bank fraud, bank robbery, money laundering, public corruption, and international and domestic terrorism.  I have participated in the execution of numerous federal arrest warrants, and have led, and coordinated with federal, state and local criminal and terrorism task forces.  Since January 2003, I have been assigned full-time to the LBRA Joint Terrorism Task Force ("JTTF"), where I have received training and gained experience in the tactics and methods used by those engaged in terrorism and related crimes.

2.    This affidavit is made in support of a complaint charging HAMMAD RIAZ SAMANA ("SAMANA") with Conspiracy to Murder U.S. Armed Forces Personnel in violation of Title 18, United States Code, Section 1117.

3.    The facts set forth in this affidavit are based on my personal observations, my training and experience, and information obtained from other law enforcement agents and witnesses.  This affidavit is intended to show that there is

probable cause to support the requested complaint and does not purport to set forth all of my knowledge or investigation into this matter.

4. On July 6, 2005, the LBRA was notified by JTTF Task Force member Detective Matt Schlerf that two individuals (hereinafter identified as "Co-Conspirator #1" and "Co-Conspirator #2") were arrested by the Torrance Police Department ("TPD") after the individuals committed the armed robbery of a Chevron gas station in Fullerton, California.

5. I subsequently reviewed numerous TPD documents and contacted TPD officers and detectives involved in the case, and learned, among other things, that:

a. On or about July 6, 2005, both Co-Conspirator #1 and Co-Conspirator #2 admitted to committing the Fullerton armed robbery when questioned post-Miranda by law enforcement officers. Co-Conspirator #2 also admitted to committing a total of ten other such robberies, five of them with Co-Conspirator #1.

b. On July 6, 2005, TPD sought and obtained a State of California search warrant for the Co-Conspirators' residence in Los Angeles. The following items, among others, were seized from the Co-Conspirators' residence:

(1) A two-page handwritten document entitled "Modes of Attack." The document lists, in part, "Military Targets" including the addresses of two U.S. military facilities

2

in West Los Angeles, as well as approximately eighteen addresses which are identified in the document as "Army Recruiting Centers."

(2)    Three shotgun slugs;

(3)    Multiple knives in boxes;

(4)    One shotgun shell carrier for quick reloading;

(5)    Three tactical military vests; and

(6)    Camouflaged clothing, including pants, jacket, hats, and a ski mask.

6 . Co-Conspirator #1 was subsequently interviewed by FBI Special Agents ("SAs") and a JTTF Task Force Officer ("TFO"). I have spoken to the SAs and TFO, as well as reviewed the transcripts of the post-Miranda interviews conducted on July 6 and July 7, 2005. I learned the following about what Co-Conspirator #1 said to law enforcement:

a.    He was the leader of a "Mashoor" (phonetic) or "council" of Muslims who had planned to carry out two operations in the Los Angeles area as part of "jihad" against the United States.

b.    The council had been assembled to respond to the oppression of Muslims in Iraq and Afghanistan by the U.S. government.

c.    The council accepted the possibility that they

3

could die carrying out the operations.

d.    The council typically met twice a week.

e.    The first group of targets considered by the council were military recruitment offices in the southern California area.  The plan was to attack approximately 10 recruitment offices for which they estimated 30 to 40 casualties.

f.    Someone in the council had conducted reconnaissance of recruitment center locations which were potential targets.

g.    The council also evaluated whether a bomb would be feasible or whether it would be better to use rifles and inflict as many casualties as possible.

h.    A shotgun which Co-Conspirator #1 used during the Fullerton Chevron robbery and a .223 caliber rifle, which was purchased by Co-Conspirator #2 and was supposed to be picked up on July 10, 2005, were going to be used in the attacks.

i.    He was familiar with the Modes of Attack document but denied preparing it.

j.    Addresses in the Modes of Attack document were military targets such as recruitment centers.

k.    The planning for the attacks was almost complete and had been going on for the past month.

7.  Co-Conspirator #2 was also interviewed by FBI Special Agents ("SAs") and a JTTF TFO. I have spoken to the SAs and TFO,

4

as well as reviewed the transcripts of the post-Miranda interviews conducted on July 6 and July 7, 2005. I learned the following about what Co-Conspirator #2 said to law enforcement:

a. All Muslims have an obligation to jihad, and the gas station robberies he committed with Co-Conspirator #1 were part of a jihad against the U.S., particularly against American oil companies who are stealing from "our countries," i.e., Muslim countries.

b. The ultimate goal is to die for Allah in a jihad. In a jihad, you only go after the people who are guilty, not the "extras" like women and children. It is okay to use a bomb if the people you are targeting are guilty.

c. He had recently purchased a .223 caliber rifle, which would be ready for pickup on July 10, 2005. The money used to purchase the rifle was at least partially obtained from the proceeds of the gas station robberies.

8. On August 1, 2005, I interviewed SAMANA, and he told me the following:

a. SAMANA stated that he first began discussions with Co-Conspirator #1 and Co-Conspirator #2 about the Iraqi War and Guantanamo Bay. Co-Conspirator #1 felt that something must be done to punish the United States. SAMANA agreed with that sentiment at that time. Over time, SAMANA became closer to Co-Conspirator #1 and eventually gave an oath of allegiance to Co-

5

Conspirator #1.  Part of the oath required SAMANA to obey Co-Conspirator #1 and not to talk about the group activities.  The group consisted of Co-Conspirator #1, Co-Conspirator #2 and SAMANA.  Co-Conspirator #1 was the leader of the group and Co-Conspirator #2 and SAMANA were the "mujahaddin."

b.  SAMANA wrote a document entitled "Modes of Attack" sometime between July 1, 2005 and July 6, 2005.  SAMANA stated that while he was in the residence of Co-Conspirator #1 and Co-Conspirator #2, Co-Conspirator #1 told SAMANA that he wanted SAMANA to research several locations that would be suitable for an attack.  SAMANA went to his home and began to research the locations given to him by Co-Conspirator #1.  SAMANA used the internet on his home computer to research these locations.  SAMANA then wrote down the information that he found regarding the locations on two sheets of paper, which became the "Modes of Attack" document.

c.  SAMANA then traveled back to the Co-Conspirators' residence, where he, Co-Conspirator #1, and Co-Conspirator #2 discussed the information on the "Modes of Attack" document he had written.  SAMANA and Co-Conspirator #1 discussed the timing of the attack, with Co-Conspirator #1 favoring an immediate attack, while SAMANA wanted to make sure they were ready to carry out the attack. SAMANA and his fellow conspirators felt that an attack on United States military targets was justified because of

the mistreatment of Muslim prisoners in Guantanamo Bay and the unjust war in Iraq. SAMANA stated that the stars, circles and asterisks on the "Modes of Attack" document correspond to the same insignias on a map of Los Angeles, California, which was located in the Co-Conspirators' residence.  SAMANA also stated that some of the writing on the Modes of Attack document was done at the Co-Conspirators' residence while SAMANA, Co-Conspirator #1, and Co-Conspirator #2 discussed the United States military locations to attack.

   d. SAMANA said that the plan was for Co-Conspirator #1 to enter the military location selected as the first target, followed by Co-Conspirator #2 and SAMANA.  All three participants would then begin shooting the people in the military location. The plan was not to become martyrs during this attack, but rather to attack and then flee in a car they drove to the location.  Co-Conspirator #1 told SAMANA that they would be "quiet" about the attack while they planned their next action.  In other words, the group would not claim credit for the attack.  The date of the attacks was going to be sometime in September or October of 2005, according to SAMANA.

   e. On July 4, 2005, SAMANA, Co-Conspirator #1, and Co-Conspirator #2 each conducted target shooting at a park in Los Angeles, with a gun SAMANA described as having a pistol-grip and a pump action.  SAMANA's description of the gun used for target

shooting matches the description of the shotgun Co-Conspirator #1 used in the Fullerton armed robbery.

9.      Through my review of the Modes of Attack document and through the course of this investigation, I have learned, among other things, the following:

a.   Most of the locations included in the "Modes of Attack" document were included under the headings "Military Targets," "Army Recruiting Centers throughout the county," "Army Ball," and "Military Base."

b.   A total of ten (10) addresses are noted on the document under the heading "Army Recruiting Centers throughout the county."  A check of these addresses revealed that all were, or had been, United States military recruiting stations in Los Angeles County.

c.   Two addresses were noted under the heading "Military Targets."  A check of these addresses revealed that they were both active or reserve United States military offices.

d.   One address in the document was noted under the heading for "Army Ball," as well as a specific date and location. Further investigation revealed that the United States Army Ball was to take place at that location but one month prior.

10.   On July 26th and 27th of 2005, I reviewed documents which were retrieved from a computer drive located in SAMANA's residence ("SAMANA's computer"), which was searched pursuant to

8

SAMANA's consent, and I learned the following:

a.  SAMANA's computer was used to map seven addresses which appear on the "Modes of Attack" document:

b.  SAMANA's computer was used to visit a site which contained information regarding the details about the Army Ball that appears on the "Modes of Attack" document.

c. SAMANA's computer was used to conduct a search for various military recruiting centers on "citysearch.com".  Some of these recruiting centers are listed in the "Modes of Attack" document.

11.  Based on the foregoing, I assert that probable cause exists to believe that HAMMAD RIAZ SAMANA did conspire to murder U.S. Armed Forces Personnel, in violation of Title 18, United States Code, Section 1117, and at least one member of the conspiracy committed an overt act to effect the object of the conspiracy.

_____
JAMES CLINTON JUDD
Special Agent - FBI

Sworn and subscribed to before me
this ____ of August 2005

_____
UNITED STATES MAGISTRATE JUDGE

9